The SOMMERS DRUG STORES CO. EMPLOYEE PROFIT SHARING TRUST, Plaintiff-Appellee, Cross-Appellant,

v.

CORRIGAN ENTERPRISES, INC. and Walter N. Corrigan, Defendants-Appellants, Cross-Appellees.

No. 85–2377.

United States Court of Appeals, Fifth Circuit.

July 14, 1986.

Rehearing and Rehearing En Banc Denied Aug. 18, 1986.

Shannon H. Ratliff, Mark O. Knisely, Jill Beckett Cochran, Austin, Tex., for defendants-appellants, cross-appellees.

Charles B. Gorham, Charles R. Shaddox, Stephen E. Walraven, San Antonio, Tex., for plaintiff-appellee, cross-appellant.

Before THORNBERRY, POLITZ, and RANDALL, Circuit Judges.

THORNBERRY, Circuit Judge:

The Sommers Drug Stores Company Employee Profit Sharing Trust sued Walter N. Corrigan and Corrigan Enterprises, Inc., in United States District Court for the Western District of Texas, alleging that the defendants had breached their fiduciary duty to the Trust under ERISA and under state common law. Following a jury verdict in favor of the Trust and a remittitur, the district court entered a judgment awarding the Trust $552,611.87 actual damages and $1,250,000 punitive damages. Corrigan and Corrigan Enterprises appeal, asserting that the district court committed numerous errors. The Trust cross-appeals. We reverse the judgment of the district court and remand for new trial on both liability and damages.

## I. BACKGROUND

The Sommers Drug Store Company was incorporated in Delaware in 1947. Until its sale in 1977, the company engaged primarily in the retail pharmaceutical business. Its principal offices were in San Antonio, Texas.

Walter N. Corrigan became president of Sommers and a member of its board of directors in the mid-1950s. At about the same time, Sommers established a pension plan for its employees, consisting of an Employee Profit Sharing Plan and the Employee Profit Sharing Trust. Under the terms of the pension plan agreement as amended in 1976, Sommers, acting through its board of directors, had the power to

appoint the plan administrator and the trustees of the Trust. The plan administrator had the power to value the assets held by the Trust. The trustees had the power to "manage, control, sell, exchange or lease" assets held by the Trust "at such prices and upon such terms and conditions as they deem desirable." Sommers retained the power to "suspend or discontinue its contributions under the Plan, and to terminate, at any time, the Trust created under this Agreement." Walter Corrigan served as a trustee of the Trust from its inception until May 27, 1976. He became a trustee again on January 1, 1978.

During the period of his employment at Sommers, Walter Corrigan gradually acquired the company's stock. By 1977 he owned approximately 47% of the outstanding shares. The Trust held about 16% of the outstanding shares. Sommers operated forty drug stores in San Antonio, Austin, and Beaumont, Texas. The company's wholly owned subsidiary, Crockett Realty Company, owned three tracts of land, the East Houston Street and Gembler Road properties in San Antonio and a coast house in Port Aransas, Texas.

In the early and mid-1970s Sommers' board of directors explored the possibility of merging the company with or selling it to one of several national drug store companies that had expressed interest. These explorations did not bear fruit until 1977, when the board entered into negotiations with Malone & Hyde, Inc., a Tennessee corporation. To facilitate a deal with Malone & Hyde, the board decided to recommend shareholder approval of a reverse stock split, under which 250 shares of $1 par stock would be converted into one share of $250 par stock, with Sommers purchasing fractional shares. The shareholders approved this plan on June 27, 1977. The reverse split reduced the number of shareholders from 66 to 16. Sommers paid $40 per pre-split share for the fractional shares. Following the split, Walter Corrigan held approximately 52% of Sommers' outstanding shares, and the Trust held roughly 20%.

In July 1977 Malone & Hyde reached an agreement with Sommers under which Malone & Hyde would purchase all of Sommers' drug store assets and its trade name. Sommers would remain responsible for its debts. Sommers also would retain ownership of the Crockett Realty Company, which was to lease the East Houston Street property to Malone & Hyde for three years. Malone & Hyde was to hire Walter Corrigan for ten years at $100,000 per year.

The Sommers shareholders, including the Trust, approved the proposed sale in August 1977. The transaction was consummated not long afterward; Sommers received cash in excess of five million dollars and was responsible for debts exceeding two million dollars. Sommers changed its name to Corrigan Enterprises, Inc., in accordance with the agreement to surrender its trade name.

Sometime after the reverse stock split, Walter Corrigan and Sommers/Corrigan Enterprises began offering to buy the stock held by the other fifteen shareholders at $40 per pre-split share, or $10,000 per post-split share. Several shareholders took advantage of this offer. After the sale of Sommers' assets to Malone & Hyde, the Trust's trustees began considering whether to sell the Trust's shares. A debate ensued among the Trust beneficiaries over whether the offered price was adequate. Ultimately, the trustees decided to accept the offer. The beneficiaries approved this decision at a meeting on December 16, 1977. The sale was consummated on March 6, 1978.

This action was filed in October 1980. The original complaint stated causes of action for securities fraud and breach of fiduciary duty under ERISA. Subsequent amendments added claims for breach of common-law fiduciary duty and for RICO violations. The plaintiffs' fourth amended complaint, filed during trial, dropped all except the ERISA and common-law claims. The common-law claim was amended to allege that the defendants had breached a duty to the Trust to liquidate Corrigan

Enterprises and distribute the proceeds pro rata to the shareholders.[1] Both the ERISA and the common-law counts retained the allegation that the defendants had breached a duty to disclose material information to the plaintiffs. The district court held that ERISA preempted the state law claim, and the case was submitted to the jury on the ERISA claim alone.

The jury found that both Walter Corrigan and Corrigan Enterprises had breached their fiduciary duty to the Trust under ERISA. The jury fixed the fair market value of the Trust's stock at $1,146,846 and assessed punitive damages of $1,000,000 against Walter Corrigan and $1,500,000 against Corrigan Enterprises. The district court granted defendants' motion for a remittitur and entered judgment in favor of the Trust for $552,611.87 actual damages and $1,250,000 punitive damages, $500,000 against Walter Corrigan and $750,000 against Corrigan Enterprises.

On this appeal, we reverse the district court's judgment on liability because of an improper jury instruction, on actual damages because of insufficient evidence, and on punitive damages because under ERISA the Trust may not recover such damages. We discuss the ERISA preemption issue raised by the Trust's cross-appeal to guide the district court on remand. We pretermit consideration of the other issues raised by the parties.

## II. DISCUSSION

### A. *Jury Instruction on Fiduciary Duty*

The district court instructed the jury as follows on the issue of the appellants' fiduciary duty under ERISA:

> For purposes of ERISA, a person is a fiduciary with respect to a plan to the extent he exercises any discretionary authority or discretionary control respecting management of the plan or exercises any authority or control respecting management or disposition of its assets.

Under ERISA the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan. Whether Walter Corrigan or Corrigan Enterprises, Inc. exercised any authority or control respecting management or disposition of the plan's assets, depends, therefore, upon whether either Defendant exercised authority or control over the trustees.

Appellants contend that this instruction permitted the jury to find that Corrigan and Corrigan Enterprises were fiduciaries with respect to the sale of the Trust's stock merely by virtue of their status as, respectively, officer, director, and principal shareholder of Corrigan Enterprises and former employer of the trustees. In reviewing a jury instruction, "we view the charge as a whole, in the context of the entire case, and we ignore technical imperfections.... We will reverse '[if] the charge as a whole leaves us with a substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.' " *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 425 (5th Cir.1985) (quoting *McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 759 (5th Cir.1979)). Applying this standard to the charge before us, we conclude that the district court committed reversible error.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (1982), states:

> [A] person is a fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. (Emphasis added.)

The phrase "to the extent" indicates that a person is a fiduciary only with respect to those aspects of the plan over which he

---

1. The appellants contend that the district court abused its discretion in permitting the Trust to add the failure to liquidate theory by mid-trial amendment. Although we find troubling the district court's decision to permit the amendment, we need not consider the issue in light of our disposition of the appellants' other points.

exercises authority or control. *See Brandt v. Grounds*, 687 F.2d 895, 897 (7th Cir. 1982). For example, if an employer and its board of directors have no power with respect to a plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions. *See Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985); *Leigh v. Engle*, 727 F.2d 113, 133–35 (7th Cir.1984); 29 C.F.R. § 2509.75–8 D–4 (1985) (Department of Labor interpretation of § 3(21)(A)).

█ In this case, the trustees had exclusive authority under the terms of the Trust to "manage, control, sell, exchange or lease" the Trust's assets. Corrigan and Corrigan Enterprises were given no such authority, and their authority in other matters did not make them fiduciaries with respect to matters over which they had no authority. Thus, as the district court stated in its instruction, the appellants' status as fiduciaries with respect to the sale of the Trust's stock depends on whether they controlled the trustees' decision to sell.

The instruction did not go far enough, however, in spelling out the nature of the control required before Corrigan and Corrigan Enterprises could be considered fiduciaries. First, the district court should have instructed the jury that the defendants could be found fiduciaries with respect to the sale of the trust's stock *only* if they controlled the trustees' decision to sell. Second, the court should have instructed the jury that it could not infer that the defendants controlled the trustees' decision merely from the defendants' status as the trustees' former employer (in the case of Corrigan Enterprises) or as an officer and director and principal shareholder of the employer (in the case of Walter Corrigan). Nor could the jury infer control merely from the defendants' power to appoint the

trustees. To permit an inference of control from these relations alone would vitiate the notion of limited fiduciary responsibility established by the "to the extent" language in ERISA § 3(21)(A). Rather, the district court should have instructed the jury that it could find the requisite control only if the defendants, either through the use of their positions or otherwise, caused the trustees to relinquish their independent discretion in deciding whether to sell the Trust's stock and to follow instead the course prescribed by the defendants.[2]

In light of the district court's improper instruction on the fiduciary issue, we reverse the district court's judgment of liability on the jury's verdict.

### B. *Fair Market Value*

█ The jury determined that the fair market value of the Trust's stock was $1,146,846, precisely the amount offered by the Trust's expert witness, Dan Hanke. This represents approximately $108.68 per pre-split share, or $27,171.15 per post-split share for each of the Trust's shares. By contrast, the defendants' expert, Dr. Sam Hadaway, concluded that the value per pre-split share was $25 before the Malone & Hyde transaction and $34 afterward. The district court entered judgment for $552,611.87 actual damages, representing the fair market value determined by the jury, less the $400,000 purchase price paid to the Trust by the defendants, less a remittitur for the percentage interest of those beneficiaries who had opted out of the case.

Appellants argue that the evidence was insufficient to support the jury's finding of fair market value.[3] Their principal contention is that Hanke's testimony lacked probative value because his valuation was based on liquidation or asset value rather than fair market value. We must sustain

---

**2.** The Trust argues on appeal that because Walter Corrigan became a trustee of the Trust on January 1, 1978, and the sale of the Trust's stock was not consummated until March 6, 1978, the jury on that basis could have found him to be a fiduciary with respect to the sale. This theory was not presented to the jury, however, either in

the district court's instructions or in counsel's argument. We decline to consider the point for the first time on appeal.

**3.** The appellants raised this point in the district court both by motion for directed verdict and by motion for j.n.o.v.

the jury's fair market value determination if, viewing the record as a whole and in the light most favorable to appellees, reasonable jurors could have made the finding that the jurors made in this case. *See Carlton v. Shelton,* 722 F.2d 203, 205 (5th Cir.), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984); *cf. Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc) (applying standard to motions for directed verdict and j.n.o.v.). Because the jury relied so heavily on Hanke's valuation, however, we must examine his testimony carefully to determine if the record supports the jury's finding. *See Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 951 (5th Cir.1975).[4]

Hanke determined Sommers' fair market value by summing the values of all the company's assets,[5] dividing by the total number of outstanding shares,[6] and multiplying the per-share value by 40, the number of post-split shares held by the Trust. Appellants contend that the resulting figure represents the liquidation or asset value of the Trust's shares, but not their fair market value. On cross-examination Hanke acknowledged that market value and asset value were different measures, but he asserted that in this case they were the same.[7] We conclude that Hanke's testimony was so conclusory and lacking in analysis that no jury could reasonably have relied on it in determining the fair market value of the Trust's stock.

Although ERISA does not define the term "fair market value," it is defined in other contexts as the price that a willing buyer would pay a willing seller, both having reasonable knowledge of the pertinent facts. *See, e.g., United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973) (applying defi-

4. In addition to Hanke's testimony, the Trust relies on testimony by James Holmes, a member of the Sommers board of directors until the company's sale and a former trustee of the Trust. The extent of Holmes' fair market value testimony is as follows:

> Q Did you know then the trust percentage roughly twenty percent of the assets was much more than $400,000?
> A It had been a million three plus.

Tr. 514. This statement, offered without analysis and not even tied to a particular time, has little probative value as to the fair market value of the Trust's stock in December 1977.

5. Among the assets that Hanke included in his total were the ten year, one million dollar employment contract given by Malone & Hyde to Walter Corrigan and the August 1980 sales price of the East Houston Street property, both discounted to present value as of 1977 or 1978. Appellants contend that the employment contract should not have been included in Corrigan Enterprises' assets and that the East Houston Street property should have been valued according to a 1977 appraisal, which was less than half the 1980 sales price. Because we find Hanke's testimony deficient in other respects, we need not consider these points.

6. Hanke divided the total asset value of Corrigan Enterprises by 197 outstanding shares of stock to obtain a per-share value. The appellants contend that the actual number of outstanding shares in December 1977 was 209, which, divided into the total assets, would produce a lower per-share value than the number

that Hanke used. We need not decide which number is correct; we merely note that the issue is open on remand.

7. Hanke's testimony on this point was equivocal. At one point during cross-examination he appeared to concede that he had testified to asset value rather than fair market value:

> Q And the fact of the matter is that you have not testified this morning in the Courtroom to market—fair market value, you testified to asset value when you reached your conclusions? Do you agree with that?
> A I agree with that.
> . . . .
> Q But the fact remains is that your testimony is asset value and not the fair market value.
> A All right.
> Q Is that correct?
> A That is correct.

Tr. 795–96. Later in the cross-examination, however, Hanke seems to have had a change of heart:

> Q I thought you told us a while ago that you were not saying that that asset value represented the fair market value of those forty shares?
> A Counsel, the approach we took in this evaluation was to approach this as a liquidation in view that there was essentially only two shareholders available and that there was no market for the stock. Under those circumstances, it is my opinion the fair market value is in fact adjusted value when you review the assets.

Tr. 803.

nition in the estate tax context); *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973) (applying definition in takings context); *Klapmeier v. Telecheck International, Inc.*, 482 F.2d 247, 252 (8th Cir.1973) (applying definition in securities fraud context); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 17 (5th Cir.1969) (applying definition in takings context). We conclude that this definition is appropriate for purposes of ERISA.

Determining fair market value for the stock of a closely held company can be difficult; typically no readily available market exists in which to determine what willing buyers are prepared to pay. This problem has arisen most frequently in the estate tax context, and it is to that area of law that we turn for guidance. The Internal Revenue Service's estate tax regulations provide that closely held stock for which there is no available market price should be valued according to "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors." 26 C.F.R. § 20.2031–2(f)(2) (1985). Among the "other relevant factors" are

> [t]he good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange.

*Id.; see also* Rev.Rul. 59–60, § 4.01, 1959–1 C.B. 237, 238–39 (offering a similar list of factors to be weighed in valuing closely held stock).

Hanke's valuation ignored most of these factors. Of particular significance, he failed to consider that the Trust's stock represented a minority position in Corrigan Enterprises. He also neglected to consider the prices at which shares of comparable companies were traded on the national exchanges. He did not take account of the prices at which Sommers' stock had changed hands in a series of tender offers between 1970 and 1977, one of the factors mentioned in Rev.Rul. 59–60. *See* Rev.Rul. 59–60, § 4.02(g), 1959–1 C.B. 237, 241–42; *see also Fitts' Estate v. Commissioner*, 237 F.2d 729, 731 (8th Cir.1956) ("In determining the value of unlisted stocks, actual sales made in reasonable amount at arm's length, in the normal course of business, within a reasonable time before or after the basic date, are the best criterion of market value."); *Duncan Industries, Inc. v. Commissioner*, 73 T.C. 266, 276 (1979) (same). Nor did Hanke consider whether a discount for lack of marketability should be applied to the Trust's stock. *See Estate of Andrews v. Commissioner*, 79 T.C. 938, 953, 957 (1982).

We do not suggest that consideration of these factors would necessarily have changed Hanke's valuation of the Trust's shares. Indeed, in support of his apparent approach, we note that under Rev.Rul. 59–60, "[t]he value of the stock of a closely held investment or real estate holding company [which Corrigan Enterprises arguably was] ... is closely related to the value of the assets underlying the stock." Rev.Rul. 59–60, § 5(b), 1959–1 C.B. 237, 243. But Hanke's utter failure to consider other relevant factors, or to explain his reasons for disregarding them, renders his testimony unworthy of credit.

We reverse the district court's judgment of actual damages and remand to the district court for new trial along with the issue of liability.

## C. *Punitive Damages*

The district court permitted the jury to award punitive damages against Corrigan and Corrigan Enterprises. The appellants contend that punitive damages may not be awarded under ERISA. The courts of appeals have split on the issue. *Compare Kuntz v. Reese*, 760 F.2d 926, 938 (9th Cir.1985) (punitive damages available in "appropriate cases" under ERISA § 409(a)), *with Powell v. Chesapeake & Potomac Telephone Co.*, 780 F.2d 419, 424

(4th Cir.1985) (punitive damages not available under ERISA § 502(a)(3)), *and Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1216 (8th Cir.) (dictum that punitive damages not available under ERISA), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). The Supreme Court recently held that an individual beneficiary cannot recover extracontractual damages, either compensatory or punitive, under ERISA § 409(a) for improper processing of benefit claims. *See Massachusetts Mutual Life Insurance Co. v. Russell,* — U.S. ——, 105 S.Ct. 3085, 3094, 87 L.Ed.2d 96 (1985); *see also Dedeaux v. Pilot Life Insurance Co.,* 770 F.2d 1311, 1313 n. 3 (5th Cir.1985) (citing *Russell* in dictum for proposition that ERISA "neither expressly nor implicitly authorizes" award of punitive damages). The Court expressly left open the two issues with which we are concerned: (1) whether a plan can recover punitive damages under ERISA § 409(a) against a trustee for breach of fiduciary duty, *see* 105 S.Ct. at 3092 n. 12; and (2) whether punitive damages may be recovered under ERISA § 502(a)(3), *see* 105 S.Ct. at 3089 n. 5. Because we are unsure under which provision the Trust has proceeded, we examine both issues. Our analysis persuades us that punitive damages are not recoverable under either approach.

*1. ERISA § 409(a).*—ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (1982), permits a civil action to be brought "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under" ERISA § 409. ERISA § 409(a) provides that anyone who breaches a fiduciary duty to a plan

> shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, *and shall be subject to such other equitable or remedial relief as the court may deem appropriate,* including removal of such fiduciary.

ERISA § 409(a), 29 U.S.C. § 1109(a) (1982) (emphasis added). The Supreme Court re-

lied on this provision's emphasis on the plan to deny extracontractual recovery to an individual beneficiary. *See Russell,* 105 S.Ct. at 3089–90. Here any recovery will benefit the plan as a whole, so we must consider whether the phrase "other equitable or remedial relief" includes punitive damages.

The language of the statute suggests that punitive damages should not be allowed. "Equitable or remedial" relief generally includes all of the kinds of relief available to restore the plaintiff's losses or protect him from future harm—recission, *e.g., Gilliam v. Edwards,* 492 F.Supp. 1255, 1267 (D.N.J.1980), removal of the trustee, *e.g., Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984), appointment of a receiver, *e.g., Marshall v. Snyder,* 572 F.2d 894, 901 (2d Cir.1978), and other similar relief. Punitive damages do not fall within the broad category of "equitable or remedial" relief; rather than restoring the plaintiff's losses and protecting him from future harm, punitive damages are designed to punish the wrongdoer and deter others from similar misconduct.

The legislative history of ERISA supports the view that punitive damages do not fit within the category of "equitable or remedial" relief. The various committee reports indicate that Congress intended to import into ERISA the fiduciary principles of the law of trusts, adapted as necessary for employee benefit plans. *See* H.Rep. No. 533, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639, 4649, 4651; S.Rep. No. 127, 93d Cong., 1st Sess., *reprinted in* 1974 U.S. Code Cong. & Ad.News 4838, 4865, 4869; 120 Cong.Rec. 29,928, 29,932 (1974) (statement by Sen. Harrison Williams introducing conference report), *reprinted in* 1974 U.S.Code Cong. & Ad.News 5177, 5186. Under the law of trusts, trustees generally are not liable for punitive damages for breach of fiduciary duty. *See, e.g., Powell,* 780 F.2d at 424 (collecting authorities). *But cf. Rivero v. Thomas,* 86 Cal.App.2d 225, 194 P.2d 533, 542 (1948) (punitive dam-

ages permitted against trustee who defrauded beneficiary); *Sharts v. Douglas,* 94 Ind.App. 201, 163 N.E. 109, 112 (1928) (en banc) (same); *Gould v. Starr,* 558 S.W.2d 755, 771 (Mo.App.1977) (acknowledging majority rule but permitting punitive damages), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978). The Restatement (Second) of Trusts supports this view. Section 205 provides:

> If the trustee commits a breach of trust, he is chargeable with
>
> (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or
>
> (b) any profit made by him through the breach of trust; or
>
> (c) any profit which would have accrued to the trust estate if there had been no breach of trust.

Restatement (Second) of Trusts § 205 (1959); *see also id.* § 206 (providing same remedies for breach of duty of loyalty); 3 A. Scott, The Law of Trusts §§ 205–206 (1967) (recognizing the three measures of recovery in Restatement (Second) § 205). Clauses (a) and (b) in § 205 correspond to the measures of recovery permitted by ERISA § 409(a), which requires the breaching fiduciary to "make good to such plan any losses to the plan resulting from each such breach" and "to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." Neither of these clauses permits recovery of punitive damages. Nor does clause (c) of § 205, which has no analogue in ERISA § 409(a), permit punitive damages. Other sections of the *Restatement* apply the principles of § 205 to particular breaches, but none authorizes a different or additional measure of damages. The *Restatement,* therefore, suggests that the law of trusts does not permit punitive damages for breach of fiduciary duty. It follows that ERISA, which incorporates the principles of trust law, does not do so either.

In holding that punitive damages may be awarded under ERISA for actual malice or wanton indifference by a fiduciary, the Ninth Circuit relied on statements in the House and Senate reports that Congress intended to provide " 'the full range of legal and equitable remedies available in both state and federal courts.' " *Russell v. Massachusetts Mutual Life Insurance Co.,* 722 F.2d 482, 491 (9th Cir.1983) (quoting H.Rep. No. 533 at 17, *reprinted in* 1974 U.S.Code Cong. & Ad.News at 4655; S.Rep. No. 127 at 35, *reprinted in* 1974 U.S.Code Cong. & Ad.News at 4871), *rev'd,* ——— U.S. ———, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). As the Supreme Court noted in reversing the Ninth Circuit, however, the committee reports refer to early versions of the bill that ultimately was enacted. These early bills provided for "appropriate relief, legal or equitable, to redress or restrain a breach of any responsibility, obligation, or duty of a fiduciary." H.R. 2, 93d Cong., 2d Sess. § 693 (1974); S. 4, 93d Cong., 1st Sess. § 603 (1973). This provision was rephrased and the word "legal" dropped in the final bill. Thus, we can give little weight to the reports' references to "legal" relief. *See Russell,* 105 S.Ct. at 3092 & n. 14.

Our analysis of the language and legislative history of ERISA § 409(a) persuades us that Congress did not intend to permit plans to recover punitive damages under that section against fiduciaries for breach of their fiduciary duty.

*2. ERISA § 502(a)(3)(B).*—An action may be brought under ERISA "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations...." ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (1982). The Supreme Court left open in *Russell* the issue whether this provision permits recovery of extracontractual compensatory or punitive damages. *See* 105 S.Ct. at 3089 n. 5. For the reasons discussed at length in the preceding subsection, we conclude that it does not. In brief, the phrase "equitable relief," as it is used in the law of trusts, does not encom-

pass punitive damages. *See Powell,* 780 F.2d at 424.

We hold that the Trust may not recover punitive damages under ERISA § 409(a) or § 502(a)(3). We reverse the judgment entered after remittitur on the jury's verdict awarding punitive damages to the Trust against Corrigan and Corrigan Enterprises.

## D. *Preemption*

■ In the common law fiduciary duty count of its fourth amended complaint, the Trust alleged that "[t]he scheme employed by Corrigan and the Corporation to purchase the shares of minority shareholders, including the Trust, at $40.00 per share ... violated the fiduciary duties owed by them to the minority shareholders." Fourth Amended Complaint ¶ 19. The Trust also claimed that the defendants breached their fiduciary duty in failing to liquidate the corporation and distribute the proceeds to the shareholders and in actually purchasing the Trust's stock. *Id.* ¶¶ 20–21. The district court held that ERISA preempts the Trust's state law breach of fiduciary duty claims. The Trust complains on cross-appeal that the district court erred.

ERISA § 514(a) provides that "the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." ERISA § 514(a), 29 U.S.C. § 1144(a) (1982). Section 514(c)(1) defines "State law" as "all laws, decisions, rules, regulations, or other State action having the effect of law," a definition broad enough to include state common law. ERISA § 514(c)(1), 29 U.S.C. § 1144(c)(1) (1982). The preemption section includes a savings clause, which excludes from preemption "any law of any State which regulates insurance, banking, or securities." *Id.* § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A) (1982). *See generally* Kilberg & Inman, *Preemption of State Laws Relating to Employee Benefit Plans: An Analysis of ERISA Section 514,* 62 Texas

L.Rev. 1313, 1316–20 (1984) (describing § 514's provisions). The Trust contends that its state law claims do not "relate to" an employee benefit plan and that the common law upon which its claims rest falls within the savings clause as a law regulating securities. Because we find the Trust's first argument dispositive, we do not address its savings clause argument.

■ The Supreme Court has given the "relate to" phrase in § 514(a) a broad, common-sense construction. *See Metropolitan Life Insurance Co. v. Massachusetts,* —— U.S. ——, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97–99, 103 S.Ct. 2890, 2900–01, 77 L.Ed.2d 490 (1983). A state law relates to an employee benefit plan "if it has a connection with or reference to such a plan." *Id.* at 97, 103 S.Ct. at 2900. Moreover, a state law that does not expressly concern employee benefit plans will still be preempted "insofar as" the law applies to benefit plans in particular cases. ERISA § 514(a); *see Shaw,* 463 U.S. at 97 n. 17, 103 S.Ct. at 2900 n. 17.

Despite its broad construction of § 514(a), however, the Supreme Court has indicated that it will not extend the "relate to" language to its outer limit. In *Shaw* the Court noted that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Id.* at 100 n. 21, 103 S.Ct. at 2901 n. 21. The Court cited with apparent approval *American Telephone & Telegraph Co. v. Merry,* 592 F.2d 118, 121 (2d Cir.1979), in which the Second Circuit held that ERISA did not preempt a state's garnishment of a spouse's benefit plan income to enforce alimony and support orders.[8]

Several courts have employed this analysis in concluding that ERISA does not preempt state laws of general application that indirectly affect benefit plans. In

---

**8.** The Seventh Circuit reached the same result on very similar facts in *Savings & Profit Sharing Fund of Sears Employees v. Gago,* 717 F.2d 1038, 1039–40 (7th Cir.1983). The court cited *Merry* and *Shaw*'s footnote 21.

*Lane v. Goren,* 743 F.2d 1337 (9th Cir. 1984), the Ninth Circuit held that ERISA did not preempt a pension plan employee's state law claim that the plan had fired him for reasons of race and age. The court noted that the state antidiscrimination law affected the plan "in its role as an employer, and in a way that all other employers are affected." *Id.* at 1340–41. Similarly, the Second Circuit held in *Rebaldo v. Cuomo,* 749 F.2d 133, 137–39 (2d Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985), that ERISA did not preempt a state law setting rates that hospitals must charge private payors, including benefit plans. The court rested its holding on two principal considerations. First, it noted that "[t]he containment of hospital costs is an exercise of a State's police powers, which should not be superseded by federal regulations unless that was the clear intent of Congress." *Id.* at 138. Second, the court found that the state law in question affected employee benefit plans only in a " 'tenuous, remote, or peripheral' " manner. *Id.* (quoting *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21). The Second Circuit concluded that when "a State statute of general application does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated." *Id.* at 139.

The Ninth Circuit relied on *Lane* and *Rebaldo* in holding that ERISA did not preempt a statute authorizing a state labor relations board to order employers who had not bargained in good faith to make their employees whole by paying them the difference between the compensation, including both wages and fringe benefits, that they actually received, and the compensation that they would have received if the employers had bargained in good faith. *Martori Bros. Distributors v. James-Massengale,* 781 F.2d 1349, 1356–59 (9th Cir. 1986). The court rejected the employers' argument that the statute was preempted because the fringe benefit portion of the make-whole order required reference to existing benefit plans.

Other courts have rejected arguments that state laws affected benefit plans in too remote, tenuous, or peripheral a manner to warrant preemption. In *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320, 326–28 (2d Cir.1985), *appeal filed,* 54 U.S. L.W. 3179 (U.S. Oct. 1, 1985), the court distinguished *Rebaldo* and *Merry* in holding that ERISA preempted a New York statute that made it a misdemeanor not to pay wages or wage supplements due employees. The court found that the employer's severance pay plan was a benefit plan within the meaning of ERISA. *See id.* at 324–26. Turning to the preemption issue, the court noted that "the state law claims seeking to enforce the severance pay policy would determine whether any benefits are paid, and directly affect the administration of benefits under the plan." *Id.* at 327. Thus, "[a]lthough the regulation of the employment relationship under [the New York statute] is an exercise by the State of its traditional police powers, the state statute does not have such a remote and tenuous connection to Burlington's severance pay plan so as to allow us to conclude that it does not 'relate to' it." *Id.*

The Second Circuit reached a similar conclusion in *Stone & Webster Engineering Corp. v. Ilsley,* 690 F.2d 323, 328–29 (2d Cir.1982), *aff'd mem. sub nom. Arcudi v. Stone & Webster Engineering Corp.,* 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983). The court held that ERISA preempted a Connecticut workers' compensation statute that required employers to continue pension plan contributions on behalf of injured employers as long as they were eligible to receive workers' compensation benefits. The court distinguished *Merry,* noting that it had dealt with "ancient family law concepts." *Id.* at 329.

Finally, in *Authier v. Ginsburg,* 757 F.2d 796 (6th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 208, 88 L.Ed.2d 177 (1985), the Sixth Circuit had to decide whether a plan administrator's state common-law cause of action for discharge in violation of public

policy based on his alleged compliance with ERISA related to an employee benefit plan. *Id.* at 800. The court concluded that ERISA preempted the administrator's state law wrongful discharge action. The court distinguished *Merry* on several grounds: The cause of action for wrongful discharge is not recognized in every state, while the family law doctrines at issue in *Merry* are; employer-employee relations have not always been the sole concern of the states, while family law matters have; and an ERISA administrator's remedies for wrongful discharge do not involve an exercise of the "basic state police power," while family law matters do. *Id.* at 800 n. 6. The court concluded that the state law related to benefit plans because Congress intended ERISA enforcement to be solely a matter of federal concern, and "[a]llowing a fiduciary to bring a state law cause of action for retaliatory discharge ... will create inconsistency in the enforcement of ERISA." *Id.* at 802.[9]

These cases are not easily distilled into a simple test for determining whether a state law of general application affects employee benefit plans in too tenuous, remote, or peripheral a manner to be preempted. The courts appear to consider two principal factors. First, if the state law involves an exercise of traditional state authority, then the courts are less likely to find that it relates to a benefit plan than if it involves a state attempt to regulate an area not tradi-

tionally left to the states. *See, e.g., Authier,* 757 F.2d at 800 n. 6; *Rebaldo,* 749 F.2d at 138. *But cf. Gilbert,* 765 F.2d at 327 (even exercise of traditional state police power preempted unless it affects benefit plans in a tenuous, remote, or peripheral manner; court treats inquiries as separate).

Second, the courts are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—than if it affects relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan. *Compare Martori Bros.,* 781 F.2d at 1356–59 (state labor statute affecting relations between employer and employee does not relate to plan despite incidental effect), *and Rebaldo,* 749 F.2d at 138–39 (state hospital cost statute that affects relations between pension plans and hospitals does not relate to plan despite economic impact), *and Lane,* 743 F.2d at 1340–41 (state antidiscrimination statute that affects relations between pension plan and employee does not relate to plan), *with Metropolitan Life Insurance Co.,* 105 S.Ct. at 2389 (state statute requiring insured plans to provide mental health benefits—thus affecting relations between plan and beneficiaries—relates to plan), *and Shaw,* 463 U.S. at 96–100, 103 S.Ct. at 2899–2902 (state statute requiring plans to provide benefits for

---

**9.** The Second and Ninth Circuits have relied in part on ERISA's definition of the term "State" in deciding preemption cases. ERISA § 514(c)(2), 29 U.S.C. § 1144(c)(2) (1982), provides: "The term 'State' includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter." These circuits have suggested that this language may limit ERISA's preemptive effect beyond any limitation implicit in the "relate to" language. *See, e.g., Martori Bros.,* 781 F.2d at 1359; *Rebaldo,* 749 F.2d at 137; *Lane,* 743 F.2d at 1339; *cf.* Kilberg & Inman, *supra,* at 1328–30 (arguing that word "purports" in § 514(c)(2) limits ERISA's preemptive sweep).

The Sixth Circuit has indicated its disapproval of the approach taken by the Second and Ninth Circuits, although it expressly declined to decide

whether § 514(c)(2) limits ERISA's preemption provision. *See Authier,* 757 F.2d at 799 n. 4. The Sixth Circuit noted that reliance on § 514(c)(2)'s "terms and conditions" language to limit ERISA preemption "would be contrary to the legislative history of ERISA. Congress rejected explicitly a proposed preemption provision which reached only specific subjects covered by ERISA in favor of the current broad language of Section 1144(a)." *Id.; see also Shaw,* 463 U.S. at 98–99 & nn. 18–20, 103 S.Ct. at 2900–01 & nn. 18–20 (describing preemption provision's evolution from narrow conflict of content approach to its broad present form).

We rest our decision in this case solely upon the "relate to" language in § 514(a). We express no opinion on the possible limitations imposed on ERISA preemption by the definition of "State" contained in § 514(c)(2).

pregnancy-based disabilities relates to plan), *and Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522–26, 101 S.Ct. 1895, 1905–08, 68 L.Ed.2d 402 (1981) (state statute prohibiting use of workers' compensation benefits to offset pension benefits relates to plan), *and Gilbert,* 765 F.2d at 326–28 (state statute requiring employer to make payments into severance pay benefit plan relates to plan), *and Authier,* 757 F.2d at 799–802 (state wrongful discharge law that affects relations between employer and plan fiduciary relates to plan).

We are not convinced that the first of these two considerations—the traditional or nontraditional nature of the state law—properly bears upon the question whether a state law of general application affects a benefit plan in so tenuous, remote, or peripheral a way that it cannot be said to "relate to" the plan. The distinction finds no support in § 514(a)'s "relate to" language. The most plausible statutory basis is § 514(c)(2), which defines the statutory term "State" as "a State, any political subdivisions thereof, or any agency or instrumentality of either, *which purports to regulate,* directly or indirectly, the terms and conditions" of benefit plans. ERISA § 514(c)(2), 29 U.S.C. § 1144(c)(2) (1982) (emphasis added). A traditional state law of general application arguably may not "purport[ ] to regulate ... the terms and conditions" of employee benefit plans. As we have noted,[10] however, we rest our decision solely upon the "relate to" language in § 514(a); we do not address the effect of § 514(c)(2).

Our focus, therefore, is upon the second factor that courts have considered, implicitly or explicitly, in construing the "relate to" language—whether the state law affects relations among the principal ERISA entities. At first glance, the state common law of corporate fiduciary duty, as applied in this case, appears to do just that. Walter Corrigan is alleged to be a fiduciary of the Sommers Employee Profit Sharing Trust. He is being sued by the Trust and its beneficiaries. Application of the state law would apparently affect relations between the alleged plan fiduciary, the plan, and the plan beneficiaries. Further analysis reveals, however, that the appearance is misleading.

The state common law of fiduciary duty that the Trust seeks to invoke in this case centers upon the relation between corporate director and shareholder. The director's duty arises from his status as director; the law imposes the duty upon him in that capacity only. Similarly, the shareholder's rights against the corporate director arise solely from his status as shareholder. That in a case such as ours the director happens also to be a plan fiduciary and the shareholder a benefit plan has nothing to do with the duty owed by the director to the shareholder. The state law and ERISA duties are parallel but independent: as director, the individual owes a duty, defined by state law, to the corporation's shareholders, including the plan; as fiduciary, the individual owes a duty, defined by ERISA, to the plan and its beneficiaries. Thus, the state law does not affect relations between the ERISA fiduciary and the plan or plan beneficiaries as such; it affects them in their separate capacities as corporate director and shareholder.

It can be argued, however, that although the duties are independent, they will nevertheless saddle the director/fiduciary with inconsistent or conflicting requirements, which in turn will affect his relations as fiduciary with the plan. But we regard this as a remote possibility, at least when, as here, the plan is a shareholder. In most cases, the duty that the director owes to the plan as shareholder will require the same course of conduct as the duty that he owes as fiduciary to the plan under ERISA. Because the ERISA duty—"the highest known to law," *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 34 L.Ed.2d 631 (1982)—imposes a standard of care at least as high as that imposed by the director-shareholder duty, the ERISA duty will gen-

**10.** *See supra* note 9.

erally be the director/fiduciary's principal guide in his relations with the shareholder/plan. In the unlikely event that the director's duty to the plan as shareholder conflicts with his duty as fiduciary under ERISA, he might have to resign one position or the other. *Cf. id.* at 276 (for directors/fiduciaries whose company was faced with a hostile takeover bid, "perhaps ... resignation [as fiduciaries] was the only proper course"). But this seems to us a remote possibility with only a minimal effect on benefit plans.

*Donovan,* although not squarely on point, supports our conclusion that the state law at issue in this case does not relate to an employee benefit plan. In *Donovan,* directors and officers of Grumman were faced with a cash tender offer from LTV Corp. The directors and officers were also trustees of the Grumman employee benefit plan, which held a block of Grumman stock. The directors and officers decided after cursory consideration to resist the LTV offer. In their role as trustees, they decided not to tender the benefit plan's shares, but instead to have the plan buy more Grumman stock. The obvious effect of the trustees' decision was to impede the LTV tender offer. The Second Circuit concluded that the district court properly granted a preliminary injunction against the LTV offer on grounds that the trustees had breached their fiduciary duty to the plan under ERISA. The court considered and rejected the contention that because the directors and officers arguably had satisfied their duty to the shareholders to investigate the tender offer, they had necessarily fulfilled their ERISA duties as trustees as well. *See id.* at 272 n. 8. That the court would consider this argument indicates its belief that the directors' and officers' state law duty to shareholders could co-exist with their ERISA duties to the benefit plan.

Several recent cases holding that ERISA preempts state law claims under circumstances superficially similar to ours can be distinguished. In *Light v. Blue Cross & Blue Shield of Alabama,* 790 F.2d 1247 (5th Cir.1986), this court held that ERISA preempts a plan beneficiary's state law breach of fiduciary duty claim against the plan administrator. The state law claim in *Light,* unlike the one in this case, affected relations between an ERISA plan fiduciary and the plan beneficiaries as such. *Powell v. Chesapeake & Potomac Telephone Co.,* 780 F.2d 419 (4th Cir.1985), and *Scott v. Gulf Oil Corp.,* 754 F.2d 1499 (9th Cir. 1985), are distinguishable on similar grounds. In *Powell,* a former employee of Chesapeake & Potomac and beneficiary of its benefit plan sued C. & P., its parent company A.T. & T., and the plan administrator under ERISA for breach of fiduciary duty and under state law for intentional infliction of emotional distress, breach of covenant of good faith and fair dealing, breach of contract, and unfair trade practices. The plaintiff alleged that the defendants had harassed her in various ways when she sought disability benefits under the plan. These state law claims, like those in *Light,* affected relations between the employer, the plan fiduciaries, and the plan beneficiaries. The court found the claims preempted by ERISA. *See Powell,* 780 F.2d at 421–22. In *Scott,* the Ninth Circuit concluded that plan beneficiaries' state law claims against their employer were preempted to the extent that "the conduct challenged by each claim was part of the administration of an employee benefit plan." *Scott,* 754 F.2d at 1505.[11]

---

11. *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091 (9th Cir.1985), cited by Corrigan, is also distinguishable. Ellenburg, an employee of Brockway and beneficiary of its benefit plan, sued under ERISA and under state law to recover early retirement benefits that he claimed had been wrongfully withheld. Among his state law claims, Ellenburg asserted that Brockway and Cunningham, Brockway's director of personnel, had breached their implied covenant of good faith and fair dealing. The court held that ERISA preempted this claim, noting that the claim "is brought against Brockway and Cunningham in their capacity as employer, rather than fiduciaries, and seemingly concerns the employment relationship. However, this claim originates from the handling and disposition of Ellenburg's claim for early retirement benefits and is therefore directly connected with the employee benefit plan...." *Id.* at 1095.

We conclude that the state common law of corporate fiduciary duty, as applied in this case, affects benefit plans in too tenuous, remote, and peripheral a manner to warrant a finding that it "relate[s] to" the plans. The state law is a law of general application; it imposes a duty on all corporate directors, whether or not they are plan fiduciaries, and it runs in favor of all shareholders, including benefit plans. It does not affect relations among the principal ERISA entities—the employer, the plan fiduciaries, the plan, and the beneficiaries— as such, but only in their independent capacities as corporate director and shareholder. In prescribing standards of conduct for corporate directors, the state law will rarely if ever impose conflicting or inconsistent duties on directors who are also plan fiduciaries. We hold, therefore, that ERISA does not preempt the cross-appellant's state law claims. On remand, the Trust may proceed with those claims.

### III. CONCLUSION

We hold that the district court erred in instructing the jury on the circumstances under which Corrigan and Corrigan Enterprises could be found to be fiduciaries with respect to the sale of the Trust's stock. We hold further that there is insufficient evidence in the record to support the jury's finding of fair market value, upon which the district court's judgment of actual damages was based. We hold that the Trust cannot recover punitive damages under either ERISA § 409(a) or ERISA § 502(a)(3). Finally, we hold that ERISA does not preempt the state law breach of fiduciary duty claims asserted in the Trust's fourth amended complaint. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.

The state law claim in *Ellenburg* arose directly out of the internal operations of the plan. The claim affected relations among the employer, the plan, and the plan beneficiary, notwithstanding its ostensible basis in the employer-employee relationship. The state law claim in this case, by contrast, arises solely from the director-shareholder relationship and involves the plan only through the fortuitous circumstance that the director is a fiduciary and the shareholder a plan.