**HERMANN HOSPITAL, Plaintiff,**

v.

**PAN AMERICAN LIFE INSURANCE CO., Defendant.**

**Civil Action No. 93–1544.**

United States District Court,
S.D. Texas,
Houston Division.

July 19, 1996.

Gail Magers, Houston, Texas, for Plaintiff.

Michael S. Forshey, Dallas, Texas, for Defendant.

## Opinion on Preëmption

HUGHES, District Judge.

### 1. *Introduction.*

Hermann Hospital sued Pan American Life Insurance Company to recover for unpaid medical services, alleging deceptive trade practices and negligent misrepresentation in the handling of the hospital's claims. Pan American will not have to pay Hermann because its claims are precluded by the federal law about benefit plans.

### 2. *Background.*

Pan American is an insurance company contractually responsible for administering medical claims by health care providers under benefit plans it insured. It issued health insurance under a benefit plan of Texas Iron Works Corporation and its parent, Pearce Industries, Inc. Alfred J. Winters, Jr., is an employee of Texas Iron and a participant in its plan.

In December 1992, Hermann admitted Geordie Winters, who is Alfred Winters's daughter and dependent. She needed care for third-degree burns she suffered in an accident. Because she was admitted during the weekend, the hospital could not verify her insurance coverage at that time. Her father showed Hermann an identification card supplied by Pan American, indicating that he was insured and giving a telephone number to verify coverage.

Hermann called Pan American after the weekend to verify coverage and benefits. Hermann spoke to a representative who said that Geordie Winters was covered by the insurance plan and indicated the extent of that coverage. Specifically, the representative told the hospital that the policy was effective January 1, 1992, that benefits were payable at 100% of the first $300, and that after a $200 deductible, the policy covered 80% of the first $3,000 and then 100% up to the lifetime maximum of $1,000,000. Hermann further confirmed the patient's eligibility with Texas Iron Works.

Relying on these representations, Hermann furnished about $19,000 in medical services to Winters through December 23, 1992. After the hospital completed her treatment, it submitted the charges to Pan American. The insurance company denied coverage because her father had ended coverage for his family in October of 1991, fourteen months earlier, in favor of individual coverage.

### 3. *Preemption*

■ If a benefit plan affects interstate commerce, the federal law regulating it blocks state-law causes of action of every configuration whose factual bases are connected to the benefit plan. Even if the claim arises under a general state law that has no direct impact on benefit plans, the claim is barred when it is made with reference to a plan. Employee Retirement Income Security Act, 29 U.S.C. § 1144(a) (1994) (ERISA). *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47–48, 107 S.Ct. 1549, 1552–53, 95 L.Ed.2d 39 (1987); *Lee v. E.I. DuPont de Nemours &*

*Co.,* 894 F.2d 755, 756 (5th Cir.1990). Hermann agrees that benefit plan of Pearce–Texas Iron Works is covered by ERISA, but it argues that its claims are distinct from the plan and are not preempted by the federal act.

To implicate federal preemption, the claim must arise under ERISA. First, the plaintiff can seek to recover a benefit defined under the terms of the plan. These cases are similar to administrative appeals in public welfare schemes. *See, e.g., Pilot Life,* 481 U.S. at 56, 107 S.Ct. at 1557 (holding that a suit by a beneficiary to recover benefits from a covered plan falls directly under ERISA, which provides an exclusive federal action for these disputes); *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 62–63, 107 S.Ct. 1542, 1545–46, 95 L.Ed.2d 55 (1987) (a parallel case decided the same day by the Supreme Court). Second, the plaintiff can seek to recover an award for an injury that arises out of the administration of a benefit plan but is beyond the benefits defined in the plan. *See Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140, 105 S.Ct. 3085, 3089, 87 L.Ed.2d 96 (1985).

### 4. *Claims.*

██ Hermann claims that it was injured by Pan American's negligence in misrepresenting the coverage available for Winters. It also seeks to recover under the Texas law about operating an insurance company. TEX. INS.CODE ANN. art. 21.21, § 16 (1981).

Hermann argues that its claims are independent actions based on Pan American's tortious conduct rather than derivative claims based on its wrongful denial of payments under the plan. Hermann does not say that Pan–American wrongly denied a payment under the plan. Because Pan American misrepresented Winters's coverage, Hermann says that its tort claims are beyond the scope of the federal statute's protection of plans.

### 5. *Independent Claims and Dependent Relations.*

██ Companies that administer benefit plans are not immune except for the acts that relate to the plan itself. If a service compa-

ny commits a wrong in its daily operations, it will be liable. Many contract and tort claims against plan administrators do not arise under the plan because they are not specific to a plan or a beneficiary. If a claim arises from administration of a benefit plan, it is blocked, but if it arises from the administration of all of the company's plans, it is not. The federal law, for example, would not preempt a landlord's claim for rent owed by the benefit plan for its office operation; nor would the law preempt a plan employee's wage. *See Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 832–33, 108 S.Ct. 2182, 2186–87, 100 L.Ed.2d 836 (1988) (holding that routine failures to pay business creditors are not preempted). Similarly, claims arising from a plan administrator's car wreck on an errand for the plan would escape preemption. And if a plan administrator threatens to tell a participant's husband that she had had an abortion, a claim against this extortionate act would not be preempted. The claims in these examples remotely affect the plan because their cost will become part of the cost of doing business, which will become part of plan prices in the future. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983) (preemption of state pregnancy discrimination law).

A benefit plan administrator may also commit a tort by exceeding the boundaries of plan administration. An instance of this situation arose where a doctor sued an employer and its benefit plan for libel. *Abofreka v. Alston Tobacco Co.,* 288 S.C. 122, 341 S.E.2d 622, 625 (1986); *approvingly mentioned* in *Mackey,* 486 U.S. at 833 n. 8, 108 S.Ct. at 2187 n. 8. A benefit plan circulated and the employer posted a memorandum asking plan participants not to use Dr. Abofreka because he mistreated and overcharged his patients; the falsity was that Abofreka only altered claims to make them covered when they otherwise were not. According to the law in South Carolina, the benefit plan's privilege to communicate its belief on matters of common interest was lost because the memorandum was posted in the company lunch room where salesmen probably saw it. Presumably, when a doctor brings a slander claim for the

defamation implicit in a benefit plan's denial of his bill, it will be precluded.

■ A state-law claim is likely to relate to a benefit plan if it affects the relations among the "principal ERISA entities"—the employer, plan, administrators, and participants, but it is still the claim, not the status of the claimants, that invokes preemption. *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1467–68 (5th Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987).

Hermann insists that its claims against Pan American are independent from the benefit plan. Hermann called Pan American because Pan American was the plan administrator and because it was the assignee of Winters's benefits under the plan. Hermann asked Pan American about the benefit plan and Winters. The information that was "unfair and deceptive" was about the benefit plan. Pan American took no action that exceeded benefit plan administration. Hermann's measure of damages is what it did not recover under the benefit plan.

Hermann says it is not claiming as the assignee of the participant but for its damage from an independent tort between businesses. Hermann has tried the assignee route and failed. *Hermann Hosp. v. MEBA Medical & Benefits Plan*, 845 F.2d 1286, 1290 (5th Cir.1988).

Hermann's claims are indistinct from a participant's claim that his employer misrepresented the plan benefits. *See, e.g., DuPont*, 894 F.2d at 757 (where employee retired relying on employer's statements that it had no plans to increase benefits for early retirement, the fraudulent and negligent misrepresentation claims were preempted); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1292–95 (5th Cir.1989) (employee's contract claim based on employer's promise that he would recover benefits if he quit was preempted); *Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir.1989). It does not matter whether it was the employee or his hospital that was misled by the benefit plan-related entities. Extensions of coverage however sought are not the plan; the preemption works like a omnipotent parole evidence rule to block all extension of amounts recoverable from entities whose involvement is related to plan benefits.

## 6. *Economics.*

The central theme of the federal legislation that blocks state law claims arising from benefit plans is to protect the plans from costs, especially transaction costs, generated by everything but the plan's own provision of benefits. When a worker gets rich from a suit for damages against a benefit plan, he does not beggar an insurance company or his employer; he reduces the plan's ability to pay the claims of his co-worker at the next machine. Funds for benefit plans are not magic. All claims against service companies that assist in administering benefit plans must be paid from the revenues they get from the employer, who in turn has only his revenue stream from the customers.

The question is: Where shall the credit risk of hospitals be placed initially? When a hospital sets a fee for a particular service, that price includes all of its expected costs for labor, rent, equipment, charity, interest, administration, insurance, and expected unrecoverable accounts receivable. Before the advent of near-universal health insurance, doctors collected only about 60% of what they billed; therefore, the people who did pay paid for the care given to others. The price of the care was set high enough that all costs were recovered by the fraction who paid. This is true of every successful business.

## 7. *Prices.*

Hospital credit costs can be left with the hospitals to be included in their pricing of services. The hospital's credit losses are not ultimately borne by it but by its paying patients. If a hospital's credit costs are *not* transferred to the claims administrator through the tort system, the hospital will have to set its prices at a level to cover them internally. If a hospital's credit costs go up, then it will raise prices. If hospitals generally raise their prices, the cost of benefit plans to employers will go up. If the cost of benefit plans goes up, employers will have to

reduce the plan benefits, reduce employment, or raise prices; all of these actions are constrained by the business's competition. If credit costs produce a general rise in prices, the new price level will be factored into the plan structures the next year.

In the competition among hospitals, those that control their credit cost will be able to furnish services to the workers at a lower cost than others. Leaving the incidence of credit risk with the hospital gives it an incentive to manage credit risk efficiently, helping workers and the economy.

8. *Torts.*

The alternative to hospital pricing at full cost is to use the tort system to attack the service companies that work for the benefit plan administrators. This is counter-productive because the service companies will adjust their prices to pass the awards and attorneys fees to the benefit plan. Administrators that are forced to pay claims not covered in the benefit plan will raise their prices or quit the business. Whether we use prices or torts, the direct, unavoidable credit cost will result in a reduction in benefits or employment, but a price system has incentives to control cost, while the torts system generates extraordinary transaction costs and irrational awards.

A costly consequence of imposing the credit risk on service companies will be that the service companies will quit answering questions, leaving the hospitals and patients worse off than under a practice of giving answers with errors. Information with errors is better than error-free total ignorance. *See* U.S. CONST. amend. I. Imposing the full cost of service company errors on them would have the effect of increasing the care of their answers, but it would have to be done by rule to eliminate litigation costs.

Some of the errors by service companies in answering hospital questions arise from the complexity of the regulations on benefits continuation, making it impossible to answer the questions accurately. The rules allow, for instance, retroactive cancellation, precluding a service company from being able to answer a question "accurately". *See* Prop.Reg. § 1.162–26, Q & A–32. Occasionally, it arises

from the willful misrepresentations of the participants; a practice that should not be encouraged by passing liability for discovery to the service companies.

Leaving aside the soft damages, the transaction costs of litigation alone will make it more expensive for hospitals to seek recoveries against third parties than to make price adjustments. Litigation is expensive, slow, and unpredictable; we have a federal law that brings stability to the provision of benefit plans, reducing the costs and increasing the use of benefit plans. Despite the illusions of social engineering through a virulent tort system, somebody somewhere has to earn the revenue to pay all claims against everybody. Treating benefit plans like a *piñata* with everybody free to try to get extras by striking at it from any angle will simply reduce the number and extent of benefit plans, which is why we have a preemption clause in the federal statute.

9. *Conclusion*

Federal statutory law restricts the grounds of suits against benefit plans. To be effective, it restricts primary, secondary, and tertiary claims derived from the provision of benefits. Hermann Hospital is claiming under the plan participant even though it may not be asserting the assignment that it has. The evanescent relation between Hermann and Pan American was because of the plan, about the plan, under the plan, and preempted.

A suit between two third-party suppliers to different plan parts does not change the relation away from the plan, even with the addition of vague tort language to the complaint. If Hermann had an independent relation with Pan American, Pan American could not create coverage where none exists in the plan, and that is the essence of Hermann's claim.

Because Hermann's claim relates to a benefit plan, Hermann will take nothing from Pan American.