# REVISED OCTOBER 31, 2002
# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————————

m 01-10831

————————————

ROBERT ROARK;
ROBERT ROARK,
ON BEHALF OF THE ESTATE OF GWEN ROARK,

Plaintiffs-Appellants,

VERSUS

HUMANA, INC.;
HUMANA HEALTH PLAN OF TEXAS, INC.,
DOING BUSINESS AS HUMANA HEALTH PLAN OF TEXAS (DALLAS),
DOING BUSINESS AS HUMANA HEALTH PLAN OF TEXAS (SAN ANTONIO),
DOING BUSINESS AS HUMANA HEALTH PLAN OF TEXAS (CORPUS CHRISTI);
HUMANA HMO TEXAS, INC.,

Defendants-Appellees.

* * * * * * * * * * * * * *

———————

№ 01-10891

———————

RUBY R. CALAD,

Plaintiff-Appellant-
Cross-Appellee,

WALTER PATRICK THORN,

Plaintiff-Cross-Appellee,

VERSUS

CIGNA HEALTHCARE OF TEXAS, INCORPORATED,
DOING BUSINESS AS HEALTHSOURCE,
DOING BUSINESS AS CIGNA CORPORATION,

Defendant-Appellee,

AETNA U.S. HEALTHCARE;
AETNA U.S. HEALTHCARE OF NORTH TEXAS, INC.,

Defendants-Appellees-
Cross-Appellants.

* * * * * * * * * * * * * *

JUAN DAVILA,

Plaintiff-Appellant,

VERSUS

AETNA U.S. HEALTHCARE, INC.;
AETNA U.S. HEALTHCARE OF NORTH TEXAS, INC.,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Texas

September 17, 2002

Before SMITH, BENAVIDES, and PARKER,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This suit consolidates multiple district court actions and appeals for consideration of common issues. Ruby Calad, Walter Thorn, Juan Davila, and Gwen Roark sued their respective health maintenance organizations ("HMO's") for negligence under Texas state law: They alleged that although their doctors recommended treatment, the HMO's negligently refused to cover it. The HMO's removed to federal court, arguing that because each plaintiff received HMO coverage through his employer's ERISA plan, the claims arose under ERISA. The plaintiffs moved to remand.

The respective district courts denied Calad, Davila, and Roark's remand motions and dismissed their claims under FED. R. CIV. P. 12(b)(6), citing ERISA preemption. The district court granted Thorn's remand motion. Roark, Calad, and Davila appeal the refusal to remand and, in the alternative, the dismissal. Thorn's HMO appeals the remand. We affirm the judgments in Roark's and Thorn's cases

and reverse with respect to Calad and Davila.

## I.
### A. Ruby Calad

Through her husband's employer, Calad became a member of CIGNA HealthCare of Texas, Inc. ("CIGNA"), a Texas HMO. Calad underwent a hysterectomy with rectal, bladder, and vaginal repair. The surgery was performed by a CIGNA physician. Although that doctor recommended a longer stay, CIGNA's hospital discharge nurse decided that the standard, one day hospital stay would be sufficient. Calad suffered complications that returned her to the emergency room a few days later; she attributes these complications to her early release.

Calad sued in state court under the Texas Health Care Liability Act ("THCLA"),[1] alleging CIGNA had failed to use ordinary care in making its medical necessity decisions, CIGNA's system made substandard care more likely, and CIGNA acted negligently when it made its medical necessity decisions. CIGNA removed to federal court based on ERISA preemption. Calad moved to remand, but the court denied the motion. The court noted "that Calad has repeatedly made clear that, should the Court deny her motion to remand, she will not amend her pleading to bring an ERISA claim and therefore requests that her claims be dismissed." Accordingly, the court dismissed under rule 12(b)(6).

### B. Walter Thorn

Thorn received Aetna U.S. Healthcare insurance through his employer. He injured his hand in a car accident, and doctors amputated his ring finger. The doctors said he needed

---

[1] TEX. CIV. PRAC. & REM. CODE §§ 88.001-88.003.

surgery in two to three days, or he would lose his hand. An Aetna-designated specialist scheduled the surgery for the next day.

A few hours before the scheduled surgery, Aetna refused to authorize its surgeon to operate. While Aetna reviewed the case, it sent a physical therapist to help exercise Thorn's hand, so it would not deteriorate while Thorn waited for surgery. Aetna eventually approved the surgery, but Thorn contends that Aetna's delay caused scarring that has diminished his manual mobility.

Thorn sued jointly with Calad. Initially, Calad and Thorn alleged that CIGNA and Aetna were jointly and severally liable. They later withdrew this allegation, explaining it was a pleading error. Thus, Calad's claims run only against CIGNA, and Thorn's runs only against Aetna. CIGNA removed to federal court (with Aetna's consent), citing ERISA preemption. Thorn moved to remand, arguing that ERISA excludes government plans such as his from preemption. The district court remanded Thorn's claim.

### C. Juan Davila

Davila is a post-polio patient who suffers from diabetes and arthritis. He received Aetna HMO coverage through his employer's health plan. His primary care physician prescribed Vioxx for Davila's arthritis pain. Studies have shown that Vioxx has a lower rate of gastrointestinal toxicity (e.g., bleeding, ulceration, perforation of the stomach) than do the other drugs on Aetna's formulary. Before filling the prescription, Aetna required Davila to enter its "step program": Davila first would have to try two different medications; only if he suffered a detrimental reaction to the medications or failed to improve would Aetna evaluate him for Vioxx use.

As part of the step program, Davila first was given naprosyn (a cheaper pain reliever). After three weeks, he was rushed to the emergency room. The doctors reported he suffered from bleeding ulcers, which caused a near heart attack and internal bleeding. The doctors gave Davila seven units of blood and kept him in critical care for five days. Now he cannot take any pain medication that is absorbed through the stomach.

Davila sued in state court under the THCLA, alleging Aetna had failed to use ordinary care in making medical necessity decisions, Aetna's systems made substandard care more likely, and Aetna acted negligently in making its medical necessity decisions. Aetna removed to federal court, citing ERISA preemption.

Davila moved to remand. The court concluded that some of Davila's claims were completely preempted under ERISA § 502(a) and thus denied remand. The court noted that normally it would dismiss Davila's state law claims and grant him leave to file an amended complaint under ERISA. But, because Davila had informed the court he would not pursue an ERISA claim, it instead dismissed with prejudice under rule 12(b)(6).

### D. Gwen Roark

In 1990, Roark was bitten by what was believed to be a brown recluse spider. The bite damaged the skin, muscle, and bone of her left leg, requiring antibiotics, three skin graft operations, and two surgeries to create "free flaps" over her wound. In 1997, Roark began using a vacuum-assisted closure device ("VAC") to circulate blood to the skin's surface and quicken healing. Each day, a nurse came to Roark's home and spent two hours scraping the wound with a scalpel; Roark wore the VAC for the other twenty-two hours of the day.

Later that year, Humana Health Plan of Texas ("Humana") became the Roarks' HMO. Roark's primary care physician recommended she continue using the VAC and authorized treatment. In 1998, Humana delayed the VAC treatments and home nursing several times; upon each delay, Roark filed an immediate appeal or grievance. The primary care physician told Humana that without the VAC and home nursing case, Roark could lose her leg. Humana eventually approved the VAC for ninety days. Humana periodically delayed VAC and home nursing treatment until December 1998, when it cancelled home nursing altogether. Humana agreed to pay only for visits to a local hospital's wound center.

In February 1999, Roark developed a serious infection that required the doctors to amputate her leg that March. While Roark was convalescing, Humana again denied her VAC treatment that may have helped heal the amputation wound. In January 2000, the doctors performed an additional amputation treatment on her leg.

Roark and her husband Robert sued in state court under the THCLA, the Texas Deceptive Trade Practices Act ("DTPA"),[2] the Texas Insurance Code,[3] and common law breach of good faith, fair dealing, and contract. Humana removed to federal court, citing ERISA preemption. The Roarks moved to remand. The court found that the Roarks' DTPA and insur-

[2] TEX. BUS. & COM. CODE § 17.46(a), (b)(5), (b)(12).

[3] TEX. INS. CODE art. 21.21 §§ 4(1), (2), (11)(a), (11)(c).

5

ance claims were completely preempted under ERISA § 502(a) and thus denied the motion.

The Roarks then amended their complaint to allege only violations of the THCLASSthat Humana had failed to use ordinary care when it made its medical necessity decisions, Humana's system made substandard care more likely, and Humana was negligent in making its medical necessity decisionsSSand filed a second remand motion. The court held that ERISA § 502(a) preempts the THCLA claim as well, denied the Roarks' motion to remand, and dismissed under rule 12(b)(6).

The court gave the Roarks thirty days to replead under ERISA § 502(a), failing which their case would be dismissed with prejudice under rule 12(b)(6). The Roarks declined and filed this appeal challenging the second remand order. The district court never entered the final order dismissing the case with prejudice under rule 12(b)(6), but it did list the case closed for statistical purposes. The Roarks' notice of appeal also states that they will not replead under ERISA.

## II.

A. Calad's and Davila's remand motions

With exceptions not relevant here, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). If, before final judgment, it appears the case was not properly removed because it was not within the federal courts' original jurisdiction, the district court must remand. 28 U.S.C. 1447(c).

The "well-pleaded complaint rule" limits federal courts' original jurisdiction to those cases in which the plaintiff's complaint states a cause of action arising under federal law; a federal defense will not do. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9-10 (1983) (citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149 (1908)). "[S]ince 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd.*, 463 U.S. at 13-14.

Calad and Davila advance only state law causes of action; a straightforward application of the well-pleaded complaint rule would deprive the federal courts of original and removal jurisdiction over their claims. But, we recognize an exception to the well-pleaded complaint rule for those few statutes whose "preemptive force . . . is so powerful as to displace entirely any state causes of action." *Id.* at 23. Where "a federal cause of action completely preempts a state cause of action, any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law." *Id.* at 24. Such actions are excepted from the well-pleaded complaint rule and confer original and removal jurisdiction. *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65-66 (1987); *Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 336 (5th Cir. 1999). The Supreme Court first recognized this exception for § 301 of the Labor-Management Relations Act ("LMRA")[4] and has extended the rule to

---

[4] *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557 (1968); *see also Franchise Tax Bd.*, 463 U.S. at 23.

some, but not all, cases under ERISA.[5]

ERISA provides two types of preemption: complete preemption under § 502(a) and conflict preemption under § 514. *Giles*, 172 F.3d at 336; *McClelland v. Gronwaldt*, 155 F.3d 507, 515-17 (5th Cir. 1998). "Section 502, by providing a civil enforcement cause of action, completely preempts any state cause of action seeking the same relief." *Id.* at 337.

Section 502(a) complete preemption is a slight misnomer, for it does not involve traditional preemption analysis. *McClelland*, 155 F.3d at 516 ("Complete preemption is less a principle of substantive preemption than it is a rule of federal jurisdiction."). We do not ask whether the state law conflicts with or frustrates a congressional purpose, but whether the state law duplicates or "falls within the scope of" an ERISA § 502(a) remedy. *Taylor*, 481 U.S. at 64; *McClelland*, 155 F.3d at 518. If Calad and Davila could have brought their claims under ERISA § 502(a), the claims would be completely preempted, and the district court would have been correct to exercise jurisdiction.

Section 514, in contrast, provides for ordinary conflict preemption.[6] State law claims that fall outside § 502(a), even though preempted by § 514, follow the well-pleaded complaint rule and do not confer original or removal jurisdiction. *Franchise Tax Bd.*, 463 U.S. at 23-27; *Giles*, 172 F.3d at 337.

We review the district court's preemption analysis, which formed the basis for its subject matter jurisdiction, *de novo*. *McClelland v. Gronwaldt*, 155 F.3d 507, 511 (5th Cir. 1998). Because we conclude that § 502(a) does not displace Calad's or Davila's claims, the district court should have remanded.

The enforcement provisions listed in ERISA § 502(a)(5)-(9) do not provide a cause of action for participants and beneficiaries; because Davila is an ERISA participant[7] and Calad is an ERISA beneficiary,[8] neither could have asserted a claim that falls within these subsections.[9] Subsections 502(a)(1)(A) and (4) deal with plan administrators' duties to supply information; they too are irrelevant. Section 502(a)(3) indicates equitable remedies are generally available under ERISA; it includes only "those categories of relief that were typically available in equity," *Great-West Life & Annuity Ins. Co. v. Knudson*, 122 S. Ct. 708, 712 (2002), not the damages claims Calad and Davila bring, *id.* at 713. This leaves only two enforcement provisions of § 502(a)[10]SS§ 502(a)(2) and (a)(1)(b)SS

---

[5] *Metropolitan Life*, 481 U.S. at 64-65.

[6] ERISA § 514(a) preempts "all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a).

---

[7] *See* 29 U.S.C. § 1002(7) ("The term 'participant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization").

[8] *See* 29 U.S.C. § 1002(8) ("The term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder").

[9] *Cf. McClelland*, 155 F.3d at 518.

[10] In its entirety, § 502(a) reads,

(continued...)

neither of which preempts Calad's or Davila's claims.

### 1. § 502(a)(2)

Calad and Davila argue that their HMO's were not acting as plan fiduciaries when denying them medical treatment, so § 502(a)(2) cannot cover (or completely preempt) their

[10](...continued)

(a) Persons empowered to bring a civil action

A civil action may be brought$S

(1) by a participant or beneficiary$S

    (A) for the relief provided for in subsection (c) of this section, or

    (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title;

(5) except as otherwise provided in subsection (b) of this section, by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter;

(6) by the Secretary to collect any civil penalty under paragraph (2), (4), (5), or (6) of
(continued...)

[10](...continued)

subsection (c) of this section or under subsection (i) or (l) of this section;

(7) by a State to enforce compliance with a qualified medical child support order (as defined in section 1169(a)(2)(A) of this title);

(8) by the Secretary, or by an employer or other person referred to in section 1021-(f)(1) of this title, (A) to enjoin any act or practice which violates subsection (f) of section 1021 of this title, or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection; or

(9) in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title or the terms of the plan, by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts.

29 U.S.C. 1132(a).

8

THCLA claims. We agree.

Section 502(a)(2) allows a plan participant or beneficiary to sue "for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109(a) in turn provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach
> . . . .

29 U.S.C. § 1109(a).

In *Pegram v. Herdrich*, 530 U.S. 211 (2000), the Court decided that under § 502-(a)(2), a patient cannot hold his HMO vicariously liable for its physician's medical malpractice. Although *Pegram* did not decide the precise question before us—whether, under § 502(a)(2), a patient can hold his HMO *directly* liable for its own medical malpractice—its holding is broad enough to apply here.

In *Herdrich*, the plaintiff became a patient of Pegram's through her HMO. When Pegram discovered an inflamed mass in Herdrich's abdomen, she did not order an immediate ultrasound; instead, she decided Herdrich would have to wait eight days to be examined at a center fifty miles away; in the meantime, Herdrich's appendix ruptured.

Herdrich sued Pegram for medical malpractice and sued both Pegram and her HMO under ERISA §§ 502(a)(2) and 1109, alleging that the HMO's medical rationing scheme, by

which it "reward[ed] its physician owners for limiting medical care, entailed an inherent breach of an ERISA fiduciary duty, because these terms created an incentive to make decisions in the physicians' self-interest rather than in the exclusive interest of the plan participants." *Pegram*, 530 U.S. at 216.

The Court unanimously ruled that Herdrich did not state a cause of action under § 502(a). The Court first categorized Herdrich's claim. HMO's, it explained, made three types of decisions—eligibility decisions, treatment decisions, and mixed eligibility and treatment decisions. *Id.* at 228-29. Eligibility decisions "turn on the plan's coverage of a particular condition or medical procedure for its treatment." *Id.* at 228.

Pure eligibility decisions, "simple yes-or-no questions, like whether appendicitis is a covered condition," are likely rare. *Id.* Treatment decisions, "by contrast, are choices about how to go about diagnosing and treating a patient's condition." *Id.* Herdrich's case, the Court concluded, involved "the more common" mixed decision, such as "whether one treatment option is so superior . . . and needed so promptly, that a decision to proceed would meet the medical necessity requirement." *Id.* at 228-29. Claims regarding such "mixed eligibility and treatment decisions," the Court held, do not fall within § 502(a)(2). *Id.* at 231-32.

It seems beyond dispute that Calad's and Davila's claims involve such mixed decisions. CIGNA agrees its plan covers hospital stays after a hysterectomy, and Aetna agrees its plan includes a range of arthritis drugs, so we are not presented with simple yes-or-no coverage questions. Instead, we are presented with the type of "when and how" medical necessity

9

questionsSSwhether Calad was provided enough treatment (enough days in the hospital) and whether Davila was prescribed the correct treatment (naprosyn instead of Vioxx)SSthat fall within *Pegram*'s rule. *Id.* at 228-29.

*Pegram* is distinguishable in one regard: Herdrich claimed her doctor made the erroneous medical decision; Calad and Davila claim their HMO's did. But *Pegram*'s reasoning indicates this distinction is immaterial to the § 502(a)(2) analysis.

The *Pegram* Court expressed doubt that "that Congress would ever have thought of a mixed eligibility decision as fiduciary in nature." *Id.* at 231. It contrasted fiduciaries, who must "act solely in the interest of the patient without possibility of conflict," *id.* at 233, with HMO's, whose entire purpose is to balance costs against patient welfare, *id.* at 231-32. "Since inducement to ration care goes to the very point of any HMO scheme," *id.* at 221, treating HMO's as ERISA fiduciaries would entail "nothing less than the elimination of the for-profit HMO," *id.* at 233.

The *Pegram* Court went on to note the potential "mischief" the alternative holding would entail. *Id.* at 236. Such a rule would create a federal body of malpractice law applicable against HMO's and physicians. *Id.* at 235-36. And, because ERISA § 502(a) preempts any overlapping state law, this would create "a puzzling issue of preemption"; it "would seem to be a prescription for preemption of state malpractice law." *Id.* at 236. This could not be so, the Court explained, for "in the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestation of congressional purpose," *id.* at 237 (citing *N.Y. State Conference of Blue Cross & Blue Shield*

*Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995)), and it was unimaginable that Congress intended ERISA to create a federal common law of medical malpractice. *Id.*

These factors apply with equal force to a claim that an HMO breached its fiduciary duty in denying care. Such a claim demands that the HMO forego its core purpose—rationing care—and act only in the patient's interest. And, such a claim would create a federal body of malpractice law applicable against HMO's. Because *Pegram* is indistinguishable, § 502-(a)(2) does not completely preempt Calad's and Davila's THCLA claims.

### 2. § 502(a)(1)(B)

The Supreme Court has declined to decide whether § 502(a)(1)(B) displaces a medical malpractice claim involving "mixed decisions," *Pegram*, 530 U.S. at 229 n.9, and this circuit has not yet confronted the question.[11] We

---

[11] In *Corcoran v. United Healthcare, Inc.*, 965 F.2d 1321 (5th Cir. 1992), we held that § 514 preempted a patient's claim that her HMO was medically negligent for refusing to hospitalize her. Section 502(a) preemption is a subset of § 514 preemption. Although any claim that falls within § 502(a) necessarily falls within § 514, claims that fall under § 514 do not necessarily fall under § 502(a). *McClelland*, 155 F.3d at 517. Thus, *Corcoran* does not decide our question.

In *Corporate Health Ins., Inc. v. Tex. Dep't of Ins.*, 215 F.3d 526, 535 (5th Cir. 2000), *vacated on other grounds by Montemayor v. Corporate Health Ins.*, 122 S. Ct. 2617 (2002), we ruled that § 514 (and thus § 502(a)(1)(B)) does not preempt a THCLA suit holding an HMO vicariously liable for its doctor's negligence. But we cannot automatically extend *Corporate Health*'s holding to suits directly against an HMO. The *Corporate* (continued...)

now conclude that § 502(a)(1)(B) does not preempt Calad's and Davila's THCLA claims.

Section 502(a)(1)(B) allows a plan participant or beneficiary to bring a civil action "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Calad's and Davila's claims of HMO medical malpractice differ fundamentally from the § 502(a)(1)(B) claims we have recognized. Section 502(a)(1)(B), we have held, creates a cause of action for breach of contract: When a plan administrator incorrectly interprets the plan to deny benefits, the patient may sue to recover the benefits.[12] By contrast, Calad and Davila assert tort claims; they have not sued their ERISA plan administrator, nor do they challenge his interpretation of the plan.

*Dowden v. Blue Cross & Blue Shield, Inc.*, 126 F.3d 641 (5th Cir. 1997) (per curiam), is on point. The plaintiff's health insurer refused to cover the expenses she incurred treating complications from breast implants. The insurance policy limited coverage to only "medically necessary" treatments, and the plan administrator concluded that Dowden's treatment did not fit the plan's definition. *Id.* at 644. Dowden sued under § 502(a)(1)(B), claiming "the plan administrator abused its discretion in interpreting the term 'medically necessary' as expressly defined in the insurance contract," and wrongfully withheld benefits owed to her. *Id.* at 643.

Superficially, this claim resembles Calad's and Davila's: Like Calad and Davila, Dowden claimed she was wrongfully denied medically necessary treatment. But, Dowden asserted a contract claim for contract damages; Calad and Davila assert a tort claim for tort damages. Calad and Davila are not seeking reimbursement for benefits denied them: Calad is not requesting the value of an extra night at the hospital, and Davila is not requesting reimbursement for the more expensive drug the HMO denied.

In deciding Dowden's claim, we were limited to the plan and its definition of "medically necessary." For Calad and Davila, the wording of their plans is immaterial; they invoke an external, statutorily imposed duty of "ordinary care."

Furthermore, this court has treated as given that ERISA provides no cause of action for medical malpractice claims against an HMO. In *Corcoran* we noted the troubling result of our holding that ERISA § 514 bars states from providing such remedies: "The result ERISA compels us to reach means that the [plaintiffs] have no remedy, state or federal, for what

---

[11](...continued)

*Health court* held that when a doctor denies treatment, he makes a quality-of-care decision, which escapes ERISA preemption. By contrast, when an HMO denies treatment, it makes a coverage decision, and claims over such a decision are preempted by ERISA. *Id.* at 534-35 & n.24. *But cf. Pegram*, 530 U.S. at 228-30 (indicating courts should look to the substance of the decision, not the identity of the decisionmaker, in determining whether ERISA applies).

[12] *See, e.g.*, *Gosselink v. Am. Tel. & Telegraph, Inc.*, 272 F.3d 722, 726-28 (5th Cir. 2001); *Wildbur v. ARCO Chem. Co.*, 974 F2d 631, 636 (5th Cir.), *modified,* 979 F.2d 1013 (5th Cir. 1992).

11

might have been a serious mistake."[13] Nor have we ever recognized a claim of HMO medical negligence under § 502(a)(1)(B).

The Third Circuit has reached the same conclusion. In *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 352 (3d Cir. 1995), the court held that claims that an HMO had failed to exercise reasonable care in providing medical treatment are not completely preempted by § 502(a)(1)(B). The plaintiff complained that her hospital provider had acted negligently in delaying her husband's blood test. This delay led to a late diagnosis of his condition and, she argued, his untimely death. *Id.* Her HMO, she asserted, was vicariously liable for the hospital's malpractice and directly liable for negligence in selecting its medical service providers.

Such a claim, the court explained, was not completely preempted, because it "merely attacked the *quality* of benefits received." *Id.* at 356. "Nothing in the complaints indicates that the plaintiffs are complaining about their ERISA welfare plans' failure to provide benefits due under the plan. Dukes does not allege, for example, that the Germantown Hospital refused to perform blood studies on [her husband] because the ERISA plan refused to pay for the studies." *Id.* at 357.

The Third Circuit's more recent decision in *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266 (3d Cir. 2001), reaffirms this conclusion. The plaintiff claimed, *inter alia*, that her HMO "'negligently and carelessly delayed in giving its approval for the necessary surgery which the plaintiff . . . urgently needed.'" *Id.* at 270

(alterations in original). Although the court held that ERISA § 502(a)(1)(B) completely preempted this claim, it grounded its holding in its finding that the claim involved "core administrative function," the type of "pure eligibility decision" as defined by *Pegram*, not the type of treatment decision involved in *Dukes. Id.* at 274.

CIGNA and Aetna cite *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987), for the proposition that Congress intended § 502(a)(1)-(B)'s contract action to be the sole remedy available. They argue that patients must pay for services ahead of time and, if the plan administrator denies benefits, sue for reimbursement under § 502(a)(1)(B). Although *Pilot Life* includes some expansive language that arguably supports CIGNA and Aetna's reading,[14] the Supreme Court's most recent word on the matter, *Rush Prudential HMO, Inc. v. Moran*, 122 S. Ct. 2151 (2002), indicates *Pilot Life* does not sweep so broadly.

In *Pilot Life*, an ERISA participant who was denied benefits sued in state court, asserting common law contract claims. The Court held § 502(a)(1)(B) preempted the claim. ERISA provides a means of collecting benefits and set forth an exclusive list of remedies; states could not create alternative causes of action for collecting benefits that expanded up-

---

[13] *Corcoran*, 965 F.2d at 1338; accord *id.* at 1333; Note, *Recent Cases*, 114 HARV. L. REV. 1406, 1409 (2001).

[14] *See, e.g.*, *Pilot Life*, 481 U.S. at 54 ("[Congress's] inclusion of certain remedies and exclusion of others . . . would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA . . . . 'Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly'" (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985)).

on ERISA's remedies. *Pilot Life*, 481 U.S. at 54-55; *Rush Prudential*, 122 S. Ct. at 2166.

Since *Pilot Life*, the Supreme Court has "found only one other state law to 'conflict' with [§ 502(a)] in providing a prohibited alternative remedy." *Rush Prudential*, *id.* In *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990), the Court held that "Texas's tort of wrongful discharge, turning on an employer's motivation to avoid paying pension benefits, conflicted with ERISA enforcement." *Rush Prudential*, 122 S. Ct. at 2166. The *Rush Prudential* Court explained its holding in *Ingersoll-Rand*: "[The] state law duplicated the elements of a claim available under ERISA, it converted the remedy from an equitable one under § 1132(a)(3) (available exclusively in federal district courts) into a legal one for money damages (available in a state tribunal)." *Rush Prudential*, *id.*

We glean from *Rush Prudential* that *Pilot Life*'s rule is a narrow one: States may not duplicate the causes of action listed in ERISA § 502(a). This is, essentially, the test employed for "complete preemption." Because the THCLA does not provide an action for collecting benefits, it is not preempted by § 502(a)(1)(B) under *Pilot Life*.

Any doubts we might have are eliminated by *Pegram*'s admonition that ERISA should not be interpreted to preempt state malpractice laws or to create a federal common law of medical malpractice. *See Pegram*, 530 U.S. at 236-37. We decline, two years after the Court expressed disbelief that Congress would federalize medical malpractice law under § 502-(a)(2), to hold that Congress has done so under § 502(a)(1)(B). Having concluded that § 502(a) does not completely preempt Calad's and Davila's THCLA claims, we vacate and remand to the district court for proceedings consistent with this decision.

### B. Thorn's motion to remand

Aetna cross-appeals the decision to remand Thorn's claims to state court. Except for those cases removed pursuant to 28 U.S.C. § 1443, "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." 28 U.S.C. § 1447(d). On its face, this statute seems to deprive us of jurisdiction over Aetna's cross-appeal. But we read § 1447(d) in conjunction with § 1447(c)'s command that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1367(c). Accordingly, § 1447(d) applies only where a district court remands for lack of subject matter jurisdiction; we may review remands based on other grounds. *Things Remembered v. Petrarca*, 516 U.S. 124, 127-28 (1995); *Giles*, 172 F.3d at 336.

Reviewable remand orders are a narrow class of cases, meaning we review a remand order only if the district court 'clearly and affirmatively' relies on a non-§ 1447(c) basis." *Giles*, 172 F.3d at 336. The district court explained that it had supplemental jurisdiction over Thorn's claim, but it was exercising its discretion under 28 U.S.C. § 1441(c) to remand. As in *Giles*, "the court affirmatively gave a non-§ 1447(c) reason for remanding and gave no indication that it believed it lacked subject matter jurisdiction." *Id.* Accordingly, "we review the district court's exercise of its discretion to remand supplemental . . . state law claims." *Id.*

The district court held that even though Thorn stated only state law causes of action, it had supplemental jurisdiction over his claims,

because they were joined to Calad's claims. Thus, the court's jurisdiction over Thorn's claims depended on its removal power over Calad's claims.[15] But, as we have explained, the district court never had removal jurisdiction over Calad's claims. Consequently, it never had subject matter over Thorn's claims, so remand was mandatory, not discretionary.[16]

### C. The Roarks' motion to remand

The Roarks' original complaint, filed in state court, stated claims under the THCLA, the DTPA, the Texas Insurance Code, and common law breach of good faith, fair dealing, and contract. Humana removed, citing ERISA preemption, and the Roarks moved to remand. Only after the district court affirmed the removal, concluding ERISA § 502(a) completely preempted the Roarks' DTPA and insurance claims, did the Roarks amend their complaint to state only THCLA claims. The Roarks made a second motion to remand, which the district court again denied; the Roarks appeal only the second denial.

If, at the time of removal, the complaint stated at least one cause of action completely preempted by § 502(a), the district court could have asserted jurisdiction over the entire case, including and claims only conflict-preempted by ERISA § 514 and any state law claims. *See*

---

[15] *See* 28 U.S.C. § 1441(c) (hinging removal of supplemental claims on the existence of "a separate and independent claim or cause of action within the jurisdiction conferred by section 1331").

[16] *Avitts v. Amoco Prod. Co.*, 53 F.3d 690, 693 (5th Cir. 1995) (explaining that if district court never had original jurisdiction over any federal claim, it could not have exercised supplemental jurisdiction over the joined state claims and was required to remand).

28 U.S.C. § 1441(c)[17]; *Giles*, 172 F.3d at 337-38.[18] Although the Roarks do not appeal the initial holding that § 502(a) completely preempts some of their original claims, we must examine it on our own initiative, because this question determines whether the district court had subject matter jurisdiction. *McClelland*, 155 F.3d at 511, 518 n.39. We review this preemption question *de novo*, *id.* at 511, and conclude the district court did have jurisdiction.

---

[17] Section 1447(c) provides,

> Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates.

28 U.S.C. § 1447(c).

[18] In *Giles* we explained,

> Hence, when a complaint raises state causes of action that are completely preempted, the district court may exercise removal jurisdiction. When a complaint contains only state causes of action that the defendant argues are merely conflict-preempted, the court must remand for want of subject matter jurisdiction. When a complaint raises both completely-preempted claims and arguably conflict-preempted claims, the court may exercise removal jurisdiction over the completely-preempted claims and supplemental jurisdiction (formerly known as "pendant jurisdiction") over the remaining claims.

*Giles*, 172 F.3d at 337-38.

14

Count six of the Roarks' original complaint alleges breach of contract: "By virtue of the policies provided to the Plaintiffs, Defendants assumed obligations, as outlined in the Member Materials and other documents provided to policy enrollees like the Roarks, to provide medically necessary treatment . . . . Defendants breached this promise to Mrs. Roark, causing her to suffer direct and serious damage." The Roarks assert that the plan's term "medically necessary treatment" includes VAC treatments.

The answer turns on interpreting the plan's language, not on applying an external, statutorily imposed standard of ordinary care. Because this is precisely the type of contract claim we recognize under § 502(a)(1)(B), *see supra* part II.A.2, this claim is completely preempted under ERISA.

This establishes that the district court had the power to entertain the Roarks' suit; it does not necessarily mean the court acted properly in doing so. The Roarks amended their complaint to state only THCLA claims, then filed a second remand motion, arguing that because all federal claims had been dismissed, 28 U.S.C. § 1367 required the court to remand the remaining supplemental state law claims. The district court ruled that the THCLA claims also were completely preempted under ERISA, so it had original jurisdiction over them and retained the case.

Because ERISA does not completely preempt the Roarks' THCLA claims, *see supra* part II, the district court had only supplemental, not original, jurisdiction over the Roarks' THCLA claims. "We review a district court's decision to retain jurisdiction over pendant [i.e, supplemental] state law claims for abuse

of discretion." *McClelland*, 155 F.3d at 519; *see also* § 1367.

Section 1367(3) allows a district court to "decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(3). The district court should evaluate whether remand furthers "the values of economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988); *accord Brown v. Southwestern Bell Tel. Co.*, 901 F.2d 1250, 1254-55 (5th Cir. 1990).

III. Dismissal of the Roarks' claims

The district court dismissed the Roarks' THCLA claims under rule 12(b)(6), citing ERISA § 514 preemption. We review a rule 12(b)(6) dismissal *de novo*. *E.g.*, *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002).

ERISA § 514 preempts "all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144-(a). We have spilled much ink over the past few decades trying to interpret this statute. By contrast, our answer today is short and direct: Our decision in *Corcoran v. United Healthcare, Inc.*, 965 F.2d 1321 (5th Cir. 1992), is on point. Although the Supreme Court has since cast doubt on *Corcoran*'s validity, we do not write on a clean slate. Our rule of orderliness prevents one panel from overturning the decision of a prior panel, so any relief for the Roarks must come from an en banc panel of this court or the Supreme Court. *Teague v. City of Flower Mound*, 179 F.3d 377, 383 (5th Cir. 1999).

15

*Corcoran* is factually indistinguishable from the Roarks' case. There, the HMO ignored its doctor's recommendation to hospitalize Mrs. Corcoran or monitor her pregnancy around the clock; instead it provided the less expensive treatment of ten hours a day of home nursing. *Corcoran*, 965 F.2d at 1324. While no nurse was on duty, Corcoran miscarried. *Id.* She sued her HMO, alleging its negligence caused her baby's wrongful death. *Id.*

We rejected both the HMO's "position that no part of its actions involve[d] medical decisions" and Corcoran's position "that no part of [her HMO's] actions involve[d] benefit determinations." *Id.* at 1332. In actuality, we explained, the HMO "makes benefit determinations as part and parcel of its mandate to decide what benefits are available under the [ERISA] plan." *Id.* "[F]rom this perspective, it becomes apparent that the Corcorans are attempting to recover for a tort allegedly committed in the course of handling a benefit determination." *Id.*

Such a claim, we reluctantly concluded, was preempted under § 514. We recognized the possible harm our ruling created: ERISA provided no cause of action for medical malpractice; if ERISA also preempted all state medical malpractice claims, patients such as the Corcorans would be left with no remedy for potentially serious mistakes. *Id.* at 1338. But, we were bound by Supreme Court precedent, which at that time articulated an expansive view of ERISA preemption.

For example, we cited *Ingersoll-Rand* for the proposition that § 514's broad "relates to" language negated the normal rules of preemption. We would not assume that preemption was less likely in areas of "traditional state au-

thority."[19] And, based on the broad language of *Pilot Life*, *Ingersoll-Rand*, and *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), we concluded that even attenuated and indirect effects on an ERISA plan are enough to bring a statute within § 514 preemption. *Corcoran*, 965 F.2d at 1328-29, 1338 n.20.

Since then, the Supreme Court has curtailed the scope of § 514 preemption, most notably in a "trilogy" of cases between 1995 and 1997. The first case, *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995), involved a New York statute requiring hospitals to collect surcharges from patients insured by a commercial carrier but exempting HMO's that provided open enrollment coverage. The Second Circuit had held that such surcharges "related to" ERISA plans: Many of these HMO's contracted with ERISA plans, and the surcharge, by affecting these HMO's' economic incentives, had an impact on plan structures.

The Court reversed in a unanimous opinion. The state statute's "indirect economic influence," the Court explained, "does not bind plan administrators to any particular choice." *Id.* at 659. It only alters "the relative costs of competing insurance to provide them," *id.* at 660, and this does not run afoul of ERISA preemption.

Two years later, a unanimous Court handed down *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316 (1997). California had

---

[19] *Corcoran*, 965 F.2d at 1334; *see also Somers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1468 (5th Cir. 1986).

16

enacted a law that required payment of prevailing wages to employees in apprenticeship non-state approved programs but allowed lower wages for apprentices participating in state approved programs. The Court held that because the law was indifferent to ERISA coverage (state-approved programs did not have to be ERISA programs), the law did not make "reference to" such plans. *Id.* at 325.

The fact that "most state-approved apprenticeship programs . . . appear to be ERISA programs" was immaterial. *Id.* at 327 n.5. Nor did California's law have a "connection with" ERISA plans. It did not bind plans, legally or practically, to a given result; it only provided economic incentives to alter their structure. *Id.* at 329. Most notably, the Court explicitly returned to a traditional preemption analysis: ERISA's "relates to" language did not "alter [the] ordinary assumption that the historic police powers of the States were not to be superseded by the Federal Act." *Id.* at 331 (internal quotation marks omitted).[20]

The last of the trilogy, *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997), held that ERISA did not preempt New York's tax on gross receipts for patient services at health care facilities. The Court acknowledged that the tax had a direct effect on ERISA plans (in fact, it eschewed any distinction between direct and indirect effects), but still upheld the statute.

[20] Justice Scalia, in a concurrence in which Justice Ginsburg joined, urged the Court to "acknowledge[] that our first take on this statute was wrong; that the 'relate to' clause . . . is meant, not to set forth a *test* for pre-emption, but rather to identify the field in which ordinary *field pre-emption* applies." *Id.* at 336 (Scalia, J., concurring).

The trilogy undermines *Corcoran* in two important ways. First, the Court established that traditional preemption rules apply under ERISA. Thus, courts should presume ERISA does not preempt areas such as "general health care regulation, which historically has been a matter of local concern." *Travelers*, 514 U.S. at 661. Second, the Court held that a state law's economic impact (direct or indirect) on plan structures is not enough to trigger § 514 preemption.

The Court's *dictum* in *Pegram* gives further reason to doubt that ERISA preempts medical malpractice claims such as the Roarks'. In holding that the plaintiff did not state a claim under § 502(a)(2), the Court, 530 U.S. at 236-37, expressed disbelief that ERISA preempts such claims:

> To be sure [*Travelers*] throws some cold water on the preemption theory; there, we held that, in the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestation of congressional purpose. But in that case the convergence of state and federal law was not so clear as in the situation we are positing; the state-law standard had not been subsumed by the standard to be applied under ERISA.

*Pegram*, 530 U.S. at 236-37.

Furthermore, after *Pegram*, *Corcoran*'s rule creates perverse incentives for HMO's. If a doctor fails to recommend treatment, the patient may sue the doctor and HMO under state law. *Id.* at. If the doctor recommends treatment, and the HMO denies coverage, the patient has no remedy. *Corcoran*, 965 F.2d at 1338. In this circuit, HMO's can escape all

17

liability if they instruct their doctors to recommend every possible treatment and leave the real decision to HMO administrators. It is difficult to believe that one of Congress's goals in passing ERISA was to shift medical judgments from doctors to plan administrators.

If we were writing on a clean slate, or deciding this en banc, the Roarks would have a strong case against ERISA preemption. But, as a panel we are bound by *Corcoran*. Accordingly, we affirm with respect to the Roarks.

In summary, the judgment in No. 01-10831, regarding the Roarks, is AFFIRMED. The judgment in No. 01-10891 is REVERSED in regard to Calad and AFFIRMED in regard to Thorn. The judgment in No. 01-10905 is REVERSED in regard to Davila. All these matters are REMANDED to the respective district courts for further proceedings, if any, that may be called for by this opinion.